UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 14-11950-RGS

PHYLLIS LANIGAN,

v.

HALLMARK HEALTH SYSTEM, INC.

MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

May 5, 2015

STEARNS, D.J.

On January 16, 2013, defendant Hallmark Health Systems, Inc. (Hallmark) notified plaintiff Phyllis Lanigan that she was the chosen casualty of a corporate reorganization. At the time she was terminated, Lanigan worked in Hallmark's Billing Department as one of eight Physician Account Representatives (PARs). More than a year later, on April 15, 2014, she filed this lawsuit in the Middlesex Superior Court asserting two claims against Hallmark: (i) interference with her employee rights under the Family Medical Leave Act (FMLA) (Count I); and (ii) termination in retaliation for her "attempt[] to take FMLA leave" on the day she was fired,

January 16, 2013 (Count II).[1]  Given the subject matter involved, Hallmark removed the case to the federal district court.

Now that discovery is complete, Hallmark seeks summary judgment. In a nutshell, Hallmark contends that Lanigan had been selected to be laid off *before* she incurred the injury for which she sought FMLA leave, thus precluding any finding of causation.  Hallmark also argues that Lanigan has failed to show that the decision makers who approved her termination were aware of her attempt to take FMLA leave, much less harbored any retaliatory animus towards her.

Lanigan, for her part,  maintains that she had taken FMLA twice before her termination, once in 2007, and again in early 2012 (although this is not pled in her Complaint) and that, as a result, she should be allowed to ask a jury to draw an inference that Hallmark sought to punish her for her prior absences.  She also relies on an incomplete (and unauthenticated) report of a Department of Labor (DOL) investigator who opined that Hallmark had violated the FMLA by terminating her.  Finally, she argues that Hallmark has failed to satisfactorily articulate why, despite prior favorable reviews for her handling of a "difficult" client account, she received the lowest score of the eight PARs on the Staff Adjustment

---

[1] *See* 29 U.S.C. § 2601, *et seq.*; 29 C.F.R. § 825.

Analysis (SAA) conducted in anticipation of the layoff decision. Lanigan argues that only a jury can evaluate the "honesty" of the manager (Melissa Kingston) who rated her so poorly on the SAA. Opp'n at 3.[2]

## BACKGROUND

The following facts are taken from Hallmark's and Lanigan's Statements of Undisputed Material Facts (SOF). *See* Fed. R. Civ. P. 56 and L.R. 56.1. Plausibly pleaded facts that are in dispute are taken in the light most favorable to Lanigan as the nonmoving party.

Lanigan was hired by Hallmark on May 22, 2006, as a Data Entry Control Clerk at its Saugus, Massachusetts facility. In April of 2007, she was promoted to the position of PAR. As a PAR, Lanigan was a member of Hallmark's Finance Department for Physician Practices, which included the Billing Department. Lanigan was primarily responsible for patient-

---

[2] At the hearing, Lanigan advanced a previously unpled "cat's-paw" theory to counter Hallmark's evidence that the supervisor (Kingston) who selected her for termination was unaware of her attempt to take FMLA leave. Under this theory, Lanigan blames a coworker, Cathy Dunn, who she insists disliked her, for manipulating Kingston into firing her. *See generally, Staub v. Proctor Hosp.*, 562 U.S. 411, 131 S. Ct. 1186, 1189 (2011) (considering "the circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision"); *Ahmed v. Johnson*, 752 F.3d 490, 496-497 (1st Cir. 2014) (same).

3

associated billing and collections from Network Health, an insurance provider for patients in Hallmark's physician network. During Lanigan's tenure at Hallmark, Melissa Kingston served as the Finance Director. Kevin Cronin managed the Billing Department. From April of 2007 until December 5, 2012, Lanigan reported to Cathy Dunn, a supervisor in the Billing Department. Thereafter, Lanigan reported to Cronin, however, Dunn continued to oversee the daily operations of the Department including "attendance and staffing." Kingston Dep. at Ex. 1.

In August of 2010, Hallmark initiated a reduction in force in the Billing Department. Kingston was responsible for determining which of the PARs would be laid off. As part of the selection process, she completed a SAA for each PAR. By virtue of her low to middling evaluation, Lanigan was among the PARs who were notified that they would be laid off as of December 31, 2010. In October of 2010, a PAR who had not been selected for termination voluntarily resigned her position. Kingston made the decision to retain Lanigan in her place.

In 2012 and early 2013, Hallmark went through a second "management reorganization" – this time company-wide – in order to "maintain and to improve the collaboration and efficiency in [its] operating performance, to judiciously reduce costs, and to evaluate real care delivery

4

changes rather than temporary trends." Clark Aff. at Ex. I. During the reorganization, Michael Turilli, Kingston's direct supervisor and Hallmark's Vice President of Finance, ordered Kingston "to eliminate either the manager or the supervisor [in the Finance – Physician Practices Department] and it was X dollars that [she] had to find." Kingston Dep. at 15-16. After an initial discussion, Kingston asked Turilli to reconsider in Dunn's case. Kingston testified,

> I went back to my boss, Mike, and where Cathy [Dunn] had been with us 20 plus years, had a wealth of knowledge, I asked if I could give her a demotion and have a pay cut, if she would be willing to do that, to save her because she ran the entire department. And if I still had to find dollars, because I had multiple physician account representatives that could cover for each other, could I find the dollars in the staff. He asked Jim Namia who was the CFO. He said "As long as human resources is okay with it, it's okay with us." I asked Madeline Hoffman, Human Resources. She told me it was fine and that was the decision.

*Id.* at 18.

> Hoffman also instructed her as follows:
>
> I assume you mean you would be changing [Dunn] to a staff position first. Then doing a reduction from among the remaining staff including her in the group. If you do this, then you would follow our Reduction in Force policy which has a worksheet (SAA). You fill one out on each staff person including Cathy. The one or ones with the lowest scores are eliminated.

Clark Aff. at Ex. K.  Kingston followed up with Turilli by email that same day reporting,

> I am going to talk with Andrea Andrews on Monday to figure out Cathy, her new position and what needs to be done to move her.  Then, I am going to meet with Johna to work on the rest next week.  I want to make Cathy's change effective immediately and the rest maybe the end of the month.  Is this okay?

*Id.*

Turilli approved and, in early December of 2012, Kingston and Cronin met with Dunn and offered her a demotion in lieu of a layoff.  Dunn accepted and was demoted effective December 5, 2012.  Also on December 5, 2012, Kingston sent an explanatory email to the PARs, attaching an organization chart showing the Billing Department as it would be staffed under the new business plan.

Following Dunn's demotion, Kingston undertook what she termed "phase two" of the Billing Department reorganization.  She completed SAAs for each PAR relying on input from Dunn and Cronin, as well as assessments from Hallmark's various office managers.  Kingston Dep. at 23-27 and Ex. 2.  She testified, however, that she did not collaborate with Cronin or Dunn on her final SAA evaluations.  Kingston scored Lanigan the lowest of the PARs and, as a result, decided that she would be laid off.  *Id.* at 28-29.  Prior to this evaluation, Lanigan had consistently received

6

favorable annual reviews, always meeting or exceeding expectations. See Pl. Ex. 33-1. As recently as April of 2012, Dunn had written that Lanigan

> completes all her tasks in an accurate and timely fashion. She takes pride in her work and is always open to new processes in order to make her time more efficient. Phyllis is always on time for work and is dressed professionally. She is positive and open when interacting with her co-workers, patients and physician offices. Phyllis is always supportive and helpful. She shares information with members of her team that is useful in receiving claims payment. She also asks for assistance when she is not able to complete her work.

Pl. Ex. 33-1 at 14.

Kingston testified that, contrary to the instructions she had received from Turilli, she did not complete a SAA for Dunn. According to Kingston, she submitted the completed SAA forms to Turilli for his approval on December 19, 2012. *See id.* at 27. On January 3, 2013, both Turilli and Hoffman signed off on the completed SAA forms and the decision to terminate Lanigan. *See id.* at 27-28.

While an employee at Hallmark, Lanigan applied for and received two FMLA leaves.[3] In 2007, she took twelve weeks of FMLA leave after she

---

[3] Hallmark's FMLA Eligibility Policy provides, in relevant part:

[c]onsistent with its intent of complying with all applicable laws Hallmark Health will comply with the requirements of the Family Medical Leave Act. Hallmark Health grants Family Medical Leaves of Absence to all employees who meet eligibility criteria. Leaves may be taken continuously, intermittently, or in the form of a reduced work schedule based on the medical

fractured her elbow. In June of 2012, she took approximately 2-3 weeks of FMLA leave after contracting a virus. On December 28, 2012, while taking down Christmas decorations at her home, Lanigan fell and broke her wrist. The following Monday (December 31), she came to work with her wrist in a sling. She informed Dunn that she had broken her wrist and would need to take time off to see her orthopedic surgeon that afternoon. On January 3, 2013, Lanigan told Dunn that she intended to pick up FMLA paperwork should she need FMLA time for "doctors' appointments or whatever." Lanigan Dep. at 112. She also told Dunn that she "did not plan to have surgery." Pl. Response to Def.'s SOF ¶ 26. Dunn approved Lanigan taking the following day off (Friday, January 4) to take the pain killers prescribed by her physician, and other time as needed.

After speaking with Dunn, Lanigan contacted Hallmark's Human Resources Department at Melrose-Wakefield Hospital, and requested an FMLA leave form, which she picked up later that day (January 3, 2013). Lanigan was told to return the completed leave application on or before

---

> documentation provided. All such leaves are unpaid unless the employee has available accrued time to use.

Lanigan Dep. Ex. 4 at 75.

January 18, 2013.[4] On January 14, 2013, Lanigan spoke to Stacey Walsh, a Human Resources representative, regarding the procedure for taking intermittent FMLA leave. Walsh explained that, if she was eligible, Lanigan could use intermittent FMLA leave for necessary physical therapy and doctor's appointments.

Kingston testified that in mid-December, when she selected Lanigan to be laid off, she had no knowledge (nor could she have) that Lanigan would request FMLA leave in January. Kingston Dep. at 36. Lanigan, for her part, admits that she had no conversations with Kingston between the time that she injured her wrist and the date (January 16, 2013) that she was notified by Hoffman of her termination.[5] Lanigan Dep. at 55. Prior to receiving the termination notice, Lanigan had never met with, or spoken to, Hoffman. Lanigan also concedes that she has no evidence that any of the other supervisors in the Billing Department had knowledge of her intent to request FMLA leave.[6] *See* Lanigan Dep. at 131-132.

---

[4] Lanigan does not recall the name of the person with whom she spoke. *Id.* at 86.

[5] It is undisputed that Kingston was on vacation in Orlando, Florida from Christmas until her return to the office on Thursday, January 3, 2013. Lanigan took a sick day on Friday, January 4. *Id.* at 57.

[6] When asked whether Cronin knew that Lanigan was going to request or did request FMLA leave, Lanigan testified "I don't know. I never spoke to him about it. I don't know." Lanigan Dep. at 133. Similarly, when asked

9

In her SOF, Lanigan states that both Dunn and Cronin had learned of Kingston's determination to select her for termination (regardless of the results of the SAA evaluations) as early as the first week of December. "Dunn testified that Kingston had determined that Lanigan would be the PAR [who] would be terminated at the time Dunn was informed of her (Dunn's) demotion, prior to Kingston completing the SAAs. Dunn. Dep. at 29." Pl. SOF ¶ 11. Lanigan also notes that "Cronin testified that Kingston had determined that Lanigan would be the PAR that would be terminated in early December, prior to Kingston completing the SAAs. Cronin Dep. at 18." Pl. SOF ¶ 12.

Following her layoff, Lanigan contacted the DOL to complain about Hallmark's alleged FMLA violation. A DOL investigator conducted a twelve-month inquiry and, after interviewing members of Hallmark's management, reached the tentative conclusion that Hallmark had discriminated against Lanigan. However, in December of 2014, when the investigator learned that Lanigan had retained private counsel, she closed

---

whether Turilli, Kingston's direct supervisor and Hallmark's Vice President of Finance, had any knowledge that she had, or was going to take, or had applied for FMLA leave, Lanigan testified "Mike Tur[i]lli didn't know me from a hole in the wall." *Id.* at 133-134. When asked whether or not Hoffman knew that Lanigan had requested FMLA leave, Lanigan testified "I don't, I don't know if she knew or not." Lanigan Dep. at 110.

10

her file "recommend[ing] that the case be concluded administratively." Pl. Ex. 3 (Dkt #32-3).

After Lanigan's termination, Hallmark distributed her job responsibilities among the remaining PARs. *See* Cronin Dep. at 9; Kingston Dep. at 32. Since that time, the Billing Department at Hallmark has not hired any additional PARS or Senior PARs. *See* Dunn Dep. at 19-20; Kingston Dep. at 34-35. While Lanigan asserts that she was the only PAR who took FMLA leave more than once, Hallmark offers undisputed evidence that two current PARs – Deanna Nobile and Janet Golini – have taken FMLA leave on more than one occasion.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a dispute to be "genuine," the "evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995) (citation omitted). "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary

judgment is appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Benoit v. Technical Mfg. Corp.,* 331 F.3d 166, 173 (1st Cir. 2003) (internal quotations omitted). However, "when the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir. 1995).

The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). "Interference" means to deny or restrict an entitlement guaranteed to an employee under the FMLA. *Colburn v. Parker Hannifin*, 429 F.3d 325, 331 (1st Cir. 2005). Under the FMLA, employers are also "prohibited from discriminating against employees . . . who have used FMLA leave." *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir. 1998), citing 29 C.F.R. § 825.220(c). "Nor may an employer 'use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions.'" *Hodgens*, 144 F.3d at 160, quoting 29 C.F.R. § 825.220(c).

To make out a prima facie case of retaliation under the FMLA, an employee "must show that (1) [s]he availed [her]self of a protected right under the FMLA; (2) [s]he was adversely affected by an employment decision; [and] (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action." *Hodgens,* 144 F.3d at 161. To state a prima facie case of FMLA interference, the plaintiff must demonstrate that (1) [s]he is an eligible employee; (2) the defendant is an employer as defined in the Act; (3) [s]he was entitled to leave under the FMLA; (4) [s]he gave the defendant notice of [her] intention to take leave; and (5) the defendant denied [her] FMLA benefits to which [s]he was entitled. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (citations omitted). In both types of FMLA claims, where there is no direct evidence of retaliation or interference, the *McDonnell Douglas*[7] framework applies, meaning that the employer must respond to the prima facie case with evidence that it had a legitimate reason unrelated to the exercise of FMLA rights for terminating (or demoting) the employee. Once the burden of production is satisfied, the plaintiff must come forward with evidence of pretext. *See Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 69 (1st Cir. 2015).

---

[7] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803(1973).

Lanigan told Dunn on January 3, 2013, that she intended to apply for FMLA leave. That Lanigan met the requirements for entitlement to leave and that Hallmark is a "covered employer" under the FMLA is not disputed. *See Colburn,* 429 F.3d at 330-331. The only issue, therefore, with respect to Lanigan's interference claim (assuming that she has made out a prima facie case), is whether her stated intent to apply for leave was the causative factor in her termination.[8] Hallmark, for its part, has come forward with a legitimate reason for Lanigan's termination – a company-wide reduction in force and a scoring process that evaluated her as the most vulnerable employee in the Billing Department. It therefore falls to Lanigan to show that her request for FMLA leave on January 3, 2013, the day that Kingston's recommendation to terminate her was approved by senior management, was the causative factor in that approval. Since it is undisputed that the senior managers had no knowledge of Lanigan's intent to request FMLA leave (something she had confided earlier that day only to Dunn), a jury

---

[8] Whether causation must be "but for" or simply "motivating" is a matter still open to debate. *Compare DiBlasi v. Liberty Mut. Grp. Inc.,* 2014 WL 1331056, at *10 (D. Mass. Apr. 3, 2014) (Stearns, J.) (requiring "but-for" causation, citing *Univ. of Texas S.W. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2534 (2013)) *with Chase v. U.S. Postal Serv.*, 2013 WL 5948373, at *8 (D. Mass. Nov. 4, 2013) (Woodlock, J.) (considering, but not deciding whether a showing of "motivating factor" causation might be sufficient).

14

would have to credit an implausible series of events to adopt Lanigan's "cats-paw" theory: namely, that upon learning that Lanigan was about to apply for FMLA leave, Dunn rushed about Hallmark and successfully secured the signatures of Kingston, Hoffman, and Turilli (executives very much her senior) on the paperwork confirming Lanigan's termination, and all before the day ended.⁹ While the court may not, as a rule, reject interested testimony that conflicts with the other parties' version of the facts, it may do so where the testimony is inherently implausible, *Dennis v. Osram Sylvania, Inc.,* 549 F.3d 851, 856 (1st Cir. 2008), or where the conflict is "[in]sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *Nat'l Amusements*, 43 F.3d at 735.

---

⁹ Kingston testified that she completed the SAAs, selected Lanigan for layoff, and put the SAAs, along with her recommendation, on Turilli's desk for approval on December 19, 2013. Lanigan argues that the date on which Kingston gave Turilli the paperwork for his approval is disputed. Lanigan cites a portion of the DOL investigator's report that states that, "Mr. Turilli previously told the writer that he signed the [SAA forms] the same day he received them" – that is, on January 3, 2013. Opp'n Mem. at 7. Whether Kingston gave the approval forms to Turilli on December 19 or January 3 has no discernible bearing on the causation issue. Lanigan also contends that there is a dispute over whether Kingston personally completed the SAAs without assistance from either Dunn or Cronin. Kingston insists that she did. Kingston Dep. at 25-28. Lanigan claims, based on the DOL investigator's report, that the SAA forms were completed by Dunn, Cronin, and Kingston ensemble. See Pl. SOF ¶14. Again, this dispute has no bearing on the ultimate merits of Lanigan's case for causation. To the extent that she claims that her evaluation on the SAA unfairly discounted her value as a Hallmark employee, this is not a matter with which the FMLA is concerned.

15

To demonstrate retaliation for engaging in FMLA-protected conduct, Lanigan "must show that the retaliator knew about her protected activity – after all, one cannot have been motivated to retaliate by something he was unaware of." *Medina-Rivera v. MVM, Inc.,* 713 F.3d 132, 139 (1st Cir. 2013). In this regard, Lanigan points to the fact that she had taken two prior FMLA leaves and, as a result, argues that a jury should be permitted to draw the inference that she was seen as a problem employee by senior Hallmark management. This is a late-blooming theory, and by surfacing only in Lanigan's memorandum opposing summary judgment, places Hallmark at an unfair disadvantage.[10] Consequently, it will not be considered by the court.

This leaves the DOL investigator's report and her opinion that Hallmark (in some undefined respect) violated the FMLA. As a general matter, only evidence that would be admissible at trial may be considered in connection with a motion for summary judgment. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49 (1st Cir. 1990). Lanigan, as the proponent of

---

[10] Hallmark argues (correctly) that Lanigan's prior FMLA leaves are not alleged anywhere in the pleadings prior to the summary judgment opposition. In the Complaint, Lanigan focuses exclusively on her December 2012 wrist injury and her January 2013 inquiry concerning FMLA leave, alleging that Hallmark retaliated against her "by terminating her employment as a direct result of her attempt to take leave under the FMLA." Compl. ¶33.

the challenged evidence, "bears the burden" of proving admissibility. *United States v. Bartelho*, 129 F.3d 663, 670 (1st Cir. 1997). Hallmark argues that Lanigan may not resort to hearsay statements or an opinion in an unauthenticated government investigator's report to create a material factual dispute. *See Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir. 2000) ("The law is well-established that '[d]ocuments supporting or opposing summary judgment must be properly authenticated.'") (internal citation omitted). As Hallmark notes, the investigator's report: (i) does not contain any findings of fact or recommendations; (ii) is based on a "limited" investigation that was prematurely "discontinu[ed]" (DOL Report at 1, 7); and (iii) is replete with inadmissible double hearsay, including hearsay statements that are internally inconsistent and contradict the sworn record in the case. Moreover, the court notes that there is no indication that the Report was ever adopted as an official statement or finding by the DOL.

"[T]he[] probative force [of agency reports] in individual cases varies considerably and is left to the determination of the trial court." *Hilton v. Wyman-Gordon Co.*, 624 F.2d 379, 383 (1st Cir. 1980) (holding that EEOC findings in general "may be significant" but that their probative value is left to the court to assess). "At bottom, the question [of admitting an agency report] is one of relevancy and prejudice under Rule 403, and it is well-

settled that abuse of discretion is the proper standard to be applied to such issues." *Patten v. Wal-Mart Stores East, Inc.*, 300 F.3d 21, 26-27 (1st Cir. 2002) (upholding exclusion of an agency report that contained conclusory statements unsupported by factual specificity). Here the court will not rely on the unauthenticated hearsay opinion of an investigator of unknown qualifications whose legal opinion would not be admissible at trial.

At the end of the day, this case is not about the FMLA, but involves a no doubt sincerely felt belief by Lanigan that she was unfairly evaluated and singled out for termination because of the animosity and influence of a coworker. Unfairness in the workplace, however, unless it is discriminatory, is not a matter with which employment discrimination law is concerned. *See, e.g., Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991) ("Courts may not sit as super personnel departments, assessing the merits -- or even the rationality -- of employers' nondiscriminatory business decisions."); *cf. Dunn v. Trs. of Boston Univ.*, 761 F.3d 63, 73 (1st Cir. 2014) ("A plaintiff cannot make pretext a trial-worthy issue by 'essentially relying on his personal belief that he was more qualified' for a job that his employer gave to someone outside of the protected class", quoting *Vega-Colon v. Wyeth Pharms.*, 625 F.3d 22, 28 (1st Cir. 2010)).

ORDER

For the foregoing reasons, Hallmark's motion for summary judgment is <u>ALLOWED</u>.  The Clerk will enter judgment accordingly and close the case.

                        SO ORDERED.

                        <u>/s/ Richard G. Stearns</u>
                        UNITED STATES DISTRICT JUDGE